IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| **SHERRY LEE HAGY,** | ) | |
| Plaintiff | ) | Civil Action No. 1:22cv00017 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social** | ) | By:   PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Sherry Lee Hagy, ("Hagy"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there

is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Hagy protectively filed her application for DIB[1] on June 11, 2020, alleging disability as of September 30, 2019, due to back problems. (Record, ("R."), at 12, 163-64, 185.) The claim was denied initially and on reconsideration. (R. at 101-12.) Hagy requested a hearing before an administrative law judge, ("ALJ"). (R. at 113-14.) A hearing was held on October 20, 2021, at which Hagy was represented by a nonattorney representative. (R. at 32-81.)

By decision dated November 2, 2021, the ALJ denied Hagy's claim. (R. at 12-27.) The ALJ found Hagy meets the nondisability insured status requirements of the Act for DIB purposes through December 31, 2024. (R. at 15.) The ALJ found Hagy had not engaged in substantial gainful activity since September 30, 2019, the alleged onset date. (R. at 15.) The ALJ determined Hagy had severe impairments, namely, thoracic spondylosis; lumbar degenerative disc disease; osteoarthritis in both knees; Osgood-Schlatter disease;[2] hypothyroidism; and obesity, but he found Hagy did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15, 17.)

---

[1] While Hagy's motion for summary judgment suggests she also filed an application for supplemental security income, ("SSI"), the record contains only a DIB application, and the ALJ's decision addresses only a DIB claim. (R. at 12.)

[2] Osgood-Schlatter's Disease is an inflammation of the area just below the knee where the tendon from the kneecap (patellar tendon) attaches to the shinbone (tibia). *See* https://www.ortho.wustl.edu/content/Patient-Care/3188/Services/Pediatric-and-Adolescent-Orthopedic-Surgery/Overview/Knee-Education-Overview/Osgood-Schaltters.aspx (last visited Feb. 10, 2023).

The ALJ found Hagy had the residual functional capacity to perform sedentary[3] work, except she could occasionally perform postural activities, but never climb ladders, ropes or scaffolds; and she could not work around concentrated exposure to vibrations and industrial hazards. (R. at 18.) The ALJ found Hagy was unable to perform any of her past relevant work. (R. at 25.) Based on Hagy's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Hagy could perform, including the jobs of a cutter and paster of press clippings; an addresser; and a document preparer. (R. at 25-26, 74-75.) Thus, the ALJ concluded Hagy was not under a disability as defined by the Act, and she was not eligible for DIB benefits. (R. at 27.) *See* 20 C.F.R. § 404.1520(g) (2021).

After the ALJ issued his decision, Hagy pursued her administrative appeals, (R. at 261-69), but the Appeals Council denied her request for review. (R. at 1-5.) Hagy then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2021). This case is before this court on Hagy's motion for summary judgment filed October 28, 2022, and the Commissioner's motion for summary judgment filed December 27, 2022.

---

[3] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2021).

*II. Facts*

Hagy was born in 1977, (R. at 37, 163), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). Hagy has a ninth-grade education, and she stated she did not receive special education.[4] (R. at 185-86.) She stated she attempted to obtain her general education development, ("GED"), diploma, but failed the test after two attempts.[5] (R. at 37-38, 57.) Hagy has past relevant work as a certified nurse's assistant, ("CNA"). (R. at 38, 71.) Hagy stated she worked as a CNA at Appalachian Agency for Seniors and was terminated for disorderly conduct after disrespecting her supervisor.[6] (R. at 38-40.)

Linda Phillips, ("Phillips"), Hagy's mother, also was present and testified at Hagy's hearing. (R. at 61-71.) She stated she saw Hagy about every other day. (R. at 61-62.) Phillips stated she helped Hagy with her laundry and housework. (R. at 62.) She stated she would help Hagy get out of the shower and get dressed about once a week. (R. at 63.) Phillips stated that there was a period of about one month during which she had to help Hagy out of the bed about four or five times. (R. at 64.)

In rendering his decision, the ALJ reviewed records from Jo McClain, Psy.D., a state agency psychologist; Nicole Sampson, Ph.D., a state agency psychologist; Dr. Jack Hutcheson, Jr., M.D., a state agency physician; Dr. Michael Koch, M.D., a

---

[4] At her hearing, Hagy stated she completed the tenth grade. (R. at 37.) However, during a November 2019 counseling session, Hagy admitted to dropping out of the tenth grade because she was "chasing guys and running around with my friends." (R. at 272.)

[5] Hagy stated that she was able to read the test without problems, but she had difficulty with the mathematics section of the test. (R. at 57.)

[6] The record shows Hagy was terminated on September 30, 2019, for unauthorized absence and insubordination. (R. at 232.) It was noted that Hagy failed to call in and was a no show on scheduled holidays, she failed to communicate with her supervisor as instructed, and she was disrespectful to her supervisor/director. (R. at 233-36.)

state agency physician; University of Virginia Health System, ("UVA"); Bland County Medical Clinic; Heartland Rehabilitation Services; Bristol Neurosurgical Associates; McGarry Orthopedic Clinic; Wellmont Medical Associates; Healing Waters Counseling Center, ("Healing Waters"); and Clinch Valley Ear Nose and Throat, ("Clinch Valley").

From March 2019 through September 2021, Hagy received treatment for hypothyroidism, depression, chronic back pain and knee pain at the Bland County Medical Clinic.[7] (R. at 390-438, 461-72, 483-503.) During this time, Hagy was in no acute distress;[8] she was pleasant, alert and fully oriented; her mood was normal; she made adequate eye contact; her back and extremities had normal range of motion;[9] she had normal curvature of the spine; her straight leg raising tests were negative, bilaterally; her extremities had no edema; she had normal muscle tone, bulk and strength in her bilateral lower extremities; she had normal sensation; and her bilateral lower extremities reflexes were 2/4 and symmetric. (R. at 401, 408, 414, 419, 422.) Hagy was advised to stop smoking, to exercise 30 minutes daily and to increase her intake of fruits and vegetables. (R. at 391, 399, 404, 406, 409, 415, 419-20, 424, 467, 471, 489.)

On November 18, 2019, Hagy saw Donna Offield, M.A., L.P.C., a licensed professional counselor at Healing Waters, for outpatient counseling services for issues pertaining to anger and forgiveness. (R. at 271-73.) She stated that she had

---

[7] During this time, Hagy was treated by Mary Jo Collie, F.N.P., a family nurse practitioner, and Sharon Cecil, F.N.P., a family nurse practitioner.

[8] On March 25, 2011, Hagy was crying in pain due to right rib pain after sneezing the prior night. (R. at 491.) X-rays showed no rib fracture or lesion. (R. at 503.)

[9] On May 19, 2020, Hagy exhibited painful upper back range of motion, and she walked with a limp. (R. at 401.)

"so much anger in me that it has absolutely consumed my life." (R. at 271.) Hagy admitted that there had been times when she felt like hurting people due to excessive anger. (R. at 272.) Hagy had adequate grooming and hygiene; she was cooperative; her speech was normal; her mood was euthymic; her affect was normal; her thought process was goal-directed and organized; she had no suicidal or homicidal ideations or ruminations; her insight and judgment were intact; she was fully oriented; and her recent and remote memory, attention and concentration were intact. (R. at 272-73.) Offield diagnosed adjustment disorder, unspecified. (R. at 273.) Hagy failed to keep her follow-up appointment scheduled for December 2, 2019. (R. at 270, 273.)

On November 22, 2019, Hagy saw Cecil, reporting she "can't stand the people she has to be around anymore." (R. at 416.) Hagy stated that she was moody and angry, and she reported family stressors, sleep disturbance, decreased energy, weight gain and moderately impaired concentration. (R. at 416.) Her examination findings remained unchanged, except she was anxious and tearful. (R. at 416.) Cecil diagnosed severe episode of recurrent major depressive disorder, without psychotic features, and other fatigue.[10] (R. at 417.) Hagy received dietary and exercise counseling and was started on Zoloft. (R. at 417.) At follow-up appointments, Hagy reported counseling was helpful, and her medications provided "significant benefit" for her depressive symptoms. (R. at 393, 404, 407, 413.)

On February 18, 2020, x-rays of Hagy's lumbar spine showed mild degenerative changes. (R. at 438.) X-rays of Hagy's thoracic spine showed a mild anterior compression at the T8 level and questionable minimal compression at the T9 level; mild to moderate hypertrophic spurs throughout the mid and lower thoracic

---

[10] Hagy complained of fatigue on March 12, 2019. (R. at 421.) In February 2020, February 2021 and June 2021, Hagy denied fatigue. (R. at 407, 461, 486.)

spine; and narrowing of the T8-T9 through the T11-T12 disc spaces. (R. at 437.) On February 25, 2020, an ultrasound of Hagy's thyroid showed an enlarged thyroid gland and multinodular goiter. (R. at 433-34.) On March 13, 2020, an MRI of Hagy's thoracic spine showed severe spinal stenosis at the T10-T11 level from a large central disc bulge; small disc bulges at the T7-T8 and T8-T9 levels without significant spinal stenosis; and no significant neural foraminal stenosis at any level. (R. at 432.)

On April 21, 2020, Hagy saw Collie, reporting right shoulder and upper arm pain, chronic low back pain and left wrist pain. (R. at 404.) Hagy was in no acute distress; her mood was normal; she made adequate eye contact; her right shoulder had no swelling or redness; and she had pain on external rotation, but normal range of motion and strength. (R. at 405.)

On April 24, 2020, Hagy saw Mark S. Mehlferber, P.A., a physician's assistant with Bristol Neurosurgical Associates, for a neurosurgical consultation for thoracic and lumbar pain without radiculopathy. (R. at 278-81.) Hagy was well-groomed; her back had decreased and painful range of motion; she had 5/5 muscle strength in all major muscle groups with normal tone, sensation and deep tendon reflexes; she was alert and fully oriented; her affect and demeanor were appropriate; and she had normal psychomotor function and speech. (R. at 280.) Mehlferber diagnosed spondylosis of the lumbar region; spondylosis without myelopathy or radiculopathy of the thoracic region; and intervertebral disc displacement of the thoracic region. (R. at 280.) Mehlferber ordered a nuclear bone scan.[11] (R. at 281.) The following month, Mehlferber and Dr. Jim C. Brasfield, M.D., a neurosurgeon

---

[11] On May 5, 2020, Hagy's bone scan showed no significant uptake in the spine; probable arthritic change in the right knee; and minimal uptake in the left proximal tibia, probably at the tibial tuberosity. (R. at 308.)

with Bristol Neurosurgical Associates, noted Hagy's MRI showed a large central T10 disc herniation. (R. at 275-77.) Hagy's examination findings remained unchanged. (R. at 276-77.) Dr. Brasfield referred Hagy to UVA for probable surgical intervention related to her T10 disc herniation. (R. at 275.)

On April 29, 2020, Hagy saw Dr. Prashanth C. Sekhar, M.D., a physician with Wellmont Medical Associates, for evaluation and treatment recommendations related to Hashimoto's thyroiditis and a nontoxic multinodular goiter. (R. at 304-06.) Hagy reported fatigue, lethargy and weight gain. (R. at 304.) Hagy was fully oriented; she was in no distress; her thyroid revealed mild fullness with a distinct nodularity in the isthmus; her musculoskeletal system had normal range of motion and no edema; and her mood and affect were normal. (R. at 306.) Dr. Sekhar diagnosed Hashimoto's thyroiditis, ordered a biopsy of the isthmus nodule and scheduled a follow up in one year. (R. at 306.)

On June 10, 2020, Hagy saw Dr. Dennis Vollmer, M.D., a physician at UVA, for back pain and lower thoracic pain. (R. at 293-99.) An MRI of Hagy's thoracic spine showed a large T10-T11 disc herniation with severe stenosis, but no evidence of cord signal abnormalities, and the cervical spine showed no evidence of stenosis. (R. at 294.) Hagy denied any lower extremity symptoms, such as numbness, weakness or gait disturbance. (R. at 295.) Hagy was alert and fully oriented; her speech was clear and fluent; she was in no acute distress; she had full motor strength in the bilateral upper and lower extremities; she had intact sensation in all extremities; her lumbar spine was tender to palpation, but there was no evidence of paraspinous muscle spasm; her extremities had no clubbing, cyanosis or edema; her deep tendon reflexes were 2+ throughout; her gait was normal; she could walk on her toes and heels; her distal pulses were intact; and she showed no evidence of

spinal cord myelopathy. (R. at 294-95.) Dr. Vollmer did not recommend surgery, but, instead, recommended and conservative treatment, including aquatic physical therapy, weight loss and home exercises with core strengthening. (R. at 295-96.)

On October 26, 2020, Hagy saw Collie, reporting bilateral knee and back pain. (R. at 390.) Hagy had normal curvature of the spine; her reflexes were diminished, bilaterally; she walked with a limp; she was in no acute distress; she had painful flexion, bilaterally, but normal range of motion of both knees; and she had small edema in the left knee and crepitus of the right knee. (R. at 390.) That same day, x-rays of Hagy's left knee showed mild narrowing of the medial and femoral tibial joint space. (R. at 426.) X-rays of Hagy's right knee showed small joint effusion; mild narrowing of the medial femoral tibial joint space; and spurring developing at the tibial fibular articulation. (R. at 425.) Collie diagnosed spinal stenosis, thoracic region; and bilateral knee pain. (R. at 390-91.) On November 24, 2020, Hagy saw Collie, reporting low back and knee pain. (R. at 469.) She denied fatigue. (R. at 469.) Hagy was in no acute distress; she had adequate eye contact; her mood was pleasant; her back had decreased range of motion; and she had painful range of motion of the bilateral knees. (R. at 470.) On that same day, an MRI of Hagy's right lower extremity was suggestive of discoid lateral meniscus, but no meniscal tear and moderate suprapatellar effusion. (R. at 455.)

On December 15, 2020, Jessica Loveday, P.A., a physician's assistant at McGarry Orthopedic Clinic, evaluated Hagy for her complaints of right knee pain with joint swelling. (R. at 458-60.) Hagy was alert and fully oriented; her mood and affect were well-adjusted; she was pleasant and cooperative; she had an antalgic gait and was limping on the right; her pulses, deep tendon reflexes and sensation in the right lower extremity were normal; she had normal coordination; her right knee

range of motion was intact; her right knee had Osgood-Schlatter's bump and knee effusion; she had normal strength and muscle tone in the right lower extremity; and her right knee had lateral and medial joint line tenderness, but was stable. (R. at 458-59.) Loveday diagnosed degenerative joint disease of the right knee, and she administered an intra-articular steroid injection. (R. at 460.) Hagy was advised to resume activities as tolerated. (R. at 460.)

On January 14, 2021, Jo McClain, Psy.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding Hagy had mild limitations in her ability to understand, remember or apply information; to interact with others; to concentrate, persist or maintain pace; and to adapt or manage herself. (R. at 86-87.) In support of this opinion, McClain stated Hagy's mental status examinations were within normal limits. (R. at 87.) She noted Hagy had been diagnosed with depression and was started on Zoloft by her primary care physician. (R. at 87.) McClain noted this medication had not been increased, and Hagy had not been referred for additional mental health treatment. (R. at 87.)

On January 14, 2021, Dr. Jack Hutcheson, Jr., M.D., a state agency physician, completed a medical assessment, finding Hagy could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of four hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally push/pull with the right lower extremity; push/pull without limitation with the upper extremities; frequently balance; and occasionally climb, stoop, kneel, crouch and crawl. (R. at 88-89.) Dr. Hutcheson noted no manipulative, visual, communicative or environmental limitations. (R. at 89.) In making this residual functional capacity determination, Dr. Hutcheson considered Hagy's degenerative disc disease with spinal stenosis and knee abnormalities. (R. at 89.)  On March 19,

2021, Dr. Michael Koch, M.D., a state agency physician, completed a medical assessment, which mirrored that of Dr. Hutcheson. (R. at 96-97.)

In January and February 2021, Hagy saw Collie, reporting low back pain, but stated her medication helped. (R. at 461, 466.) She reported her mood was stable, and she denied fatigue. (R. at 461.) Hagy was in no acute distress; she had normal eye contact; her mood was pleasant; she had normal curvature of the spine; her reflexes were 2/4 and symmetric in the lower extremities, bilaterally; her gait was unremarkable; and her extremities had no edema. (R. at 461, 466.)

On March 18, 2021, Nicole Sampson, Ph.D., another state agency psychologist, completed a PRTF, which mirrored that of McClain. (R. at 94-95.) Sampson noted Hagy's ongoing psychological treatment with her primary care physician and that her examination findings indicated that she was fully oriented with a well-adjusted mood and affect, she was pleasant and cooperative, and her mood was stable. (R. at 95.) In addition, Sampson noted that Hagy reported she was able to cook, do light housework, drive and go out alone and manage her own finances. (R. at 95.)

As previously stated, on March 25, 2021, Hagy saw Cecil, and reported she developed rib pain after sneezing. (R. at 491.) X-rays of Hagy's right rib showed no fracture, but a probable granuloma in the right mid to lower lung field was noted. (R. at 503.) Hagy was tearful and crying in pain; she had rib pain with movement and palpation on the right, but no ecchymosis or edema; her back was unremarkable; her lungs were clear to auscultation, bilaterally, with no wheezes, rhonchi or rales; her extremities had no edema; her peripheral pulses were normal, bilaterally; and she was alert and fully oriented. (R. at 491.) Cecil diagnosed right-sided rib pain. (R.

at 491.) On June 29, 2021, Hagy saw Collie, reporting her mood was stable, and she denied fatigue. (R. at 486.) Hagy was in no acute distress; she had normal eye contact; her mood was pleasant; her lungs were clear to auscultation, bilaterally, with no wheezes, rhonchi or rales; her reflexes were 2/4 in the lower extremities and symmetric, bilaterally; she walked with a limp; and her extremities had no edema. (R. at 487.)

On April 15, 2021, Loveday administered another intra-articular steroid injection in Hagy's right knee for degenerative joint disease. (R. at 480.) On August 25, 2021, Hagy saw Loveday, and reported right knee swelling, "giving away" and weakness. (R. at 480-82.) Hagy's examination findings and diagnosis remained unchanged. (R. at 480-81.) Loveday administered another intra-articular steroid injection and advised Hagy to resume activities as tolerated. (R. at 481-82.)

On September 9, 2021, Hagy saw Cecil, reporting she experienced right-sided pain with deep breaths after throwing horseshoes. (R. at 483.) Chest x-rays showed areas of atelectasis/scarring within the ventral right lower lobe and right middle lobe regions of the lung. (R. at 499.) Hagy was in no acute distress; her lungs were clear to auscultation, bilaterally, with no wheezes, rhonchi or rales; she had pain on palpation in the right armpit region and above the right breast; and she had no rib pain when palpated, but she had pain with movement. (R. at 483-84.) Cecil diagnosed muscle strain and chest wall discomfort. (R. at 484.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62

(1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Hagy argues the ALJ erred by denying her request for consultative physical and psychological examinations. (Plaintiff's Memorandum In Support Of Motion For Summary Judgment, ("Plaintiff's Brief") at 1-10.) Hagy also argues the ALJ erred in his consideration of her complaints of fatigue. (Plaintiff's Brief at 10-12.) Next, Hagy argues that substantial evidence does not exist to support the ALJ's residual functional capacity finding. (Plaintiff's Brief at 12-14.)

Hagy filed her application in June 2020; thus, 20 C.F.R. § 404.1520c governs how the ALJ considered the medical opinions here.[12] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. § 404.1520c(a) (2021). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2021) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2021).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. § 404.1520c(b)(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also*

---

[12] 20 C.F.R. § 404.1520c applies to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

20 C.F.R. § 404.1520c(c)(2). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[13] *See* 20 C.F.R. § 404.1520c(b)(2).

Hagy argues substantial evidence does not exist to support the ALJ's residual functional capacity finding because the ALJ failed to order physical and psychological examinations, and he failed to appropriately account for her "fatigue." (Plaintiff's Brief at 1-14.) On October 11, 2021, Hagy's nonattorney representative requested that the ALJ order physical and mental examinations so that Hagy's residual functional capacity could be assessed. (R. at 259-60.) At Hagy's hearing, the ALJ denied this request, stating there was a substantial number of medical reports for the relevant period contained in the file. (R. at 80.)

It is well-settled that it is the ALJ's duty to determine a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1546(c) (2021). In determining a claimant's residual functional capacity, an ALJ must consider all the relevant evidence, including medical records, medical source opinions and the claimant's subjective allegations and descriptions of her own limitations. *See* 20 C.F.R. § 404.1545(a)(1), (3) (2021). While it is the claimant's responsibility to provide the evidence used to determine her disability, the ALJ is responsible for developing the claimant's complete medical history, including arranging for a consultative examination if necessary. *See* 20 C.F.R. § 404.1545a(1), (3); *see also Bowen v. Yuckert*, 482 U.S.

---

[13] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(b)(3) (2021).

137, 147-48 (1987) (noting that a claimant bears the burden of proving her severe impairments preclude performance of any substantial gainful activity).

The regulations, however, only require an ALJ "to seek additional evidence or clarification if the ALJ cannot reach a conclusion about whether the claimant is disabled based upon the evidence in the case record." *Harper v. Saul*, 2020 WL 6074164, at *8 (D.S.C. Oct. 15, 2020). As the Fourth Circuit noted in *Bell v. Chater*, 57 F.3d 1065, 1995 WL 347142, at *4 (4th Cir. June 9, 1995) (citation and quotation omitted), "[a]lthough the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, [the ALJ] is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." *See also Lehman v. Astrue*, 931 F. Supp. 2d 682, 693 (D. Md. 2013) (noting that an "ALJ is under no obligation to supplement an adequate record to correct deficiencies in a plaintiff's case") (citation omitted).

A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. § 404.1945(a) (2021). The ALJ found Hagy had the residual functional capacity to perform sedentary work, except she could occasionally perform postural activities, but never climb ladders, ropes or scaffolds; and she could not work around concentrated exposure to vibrations and industrial hazards. (R. at 18.)

In making this residual functional capacity finding, the ALJ stated he found the state agency medical consultants' physical assessments partially persuasive, but additional limitations were warranted. (R. at 24.) The ALJ noted that these assessments were supported because the medical consultants appropriately considered the then-available evidence regarding Hagy's documented symptoms,

treatment, imaging results and clinical presentation, along with her activities of daily living. (R. at 24.) However, the ALJ noted that these assessments were not entirely consistent with the other evidence because greater exertional and postural limitations were warranted to address the cumulative effect of Hagy's back problems, lower extremity problems, thyroid problems and obesity. (R. at 24.) The ALJ noted Hagy's allegations concerning her back problems were partially consistent with the evidence, insofar as her reports of mid- and lower back pain were well-documented. (R. at 21.) Based on Hagy's documented complaints, imaging results, physical examination findings and treatment for back issues, the ALJ limited Hagy to sedentary work with reduced postural and environmental limitations, as well as limiting her exposure to vibrations and industrial hazards. (R. at 21, 24.)

As noted by the ALJ, the objective medical evidence of record showed some abnormalities related to Hagy's spine, but no serious neurological deficits were noted. (R. at 22.) During her neurosurgical examinations in April and May 2020, Hagy's back had decreased and painful range of motion, but she had 5/5 muscle strength in all major muscle groups and normal tone, sensation and deep tendon reflexes. A bone scan in May 2020 showed no significant uptake in Hagy's spine, probable arthritic change in the right knee and minimal uptake in the left proximal tibia. In June 2020, during a neurosurgical examination at UVA, Hagy had full motor strength in the bilateral upper and lower extremities; she had intact sensation in all extremities; her lumbar spine was tender to palpation, but there was no evidence of paraspinous muscle spasm; her extremities had no clubbing, cyanosis or edema; her deep tendon reflexes were 2+ throughout; her gait was normal; she could walk on her toes and heels; and her distal pulses were intact.

In October and November 2020, diagnostic imaging showed Hagy's left knee had mild narrowing of the medial and femoral tibial joint space; her right knee showed small joint effusion, mild narrowing of the medial femoral tibial joint space and spurring developing at the tibial fibular articulation; and an MRI of Hagy's right lower extremity was suggestive of discoid lateral meniscus, but no meniscal tear and moderate suprapatellar effusion. During an orthopedic encounter in December 2020, Hagy had an antalgic gait and was limping on the right; her pulses, deep tendon reflexes and sensation in the right lower extremity were normal; she had normal coordination; her right knee range of motion was intact; her right knee had Osgood-Schlatter's bump and knee effusion; she had normal strength and muscle tone in the right lower extremity; and her right knee had lateral and medial joint line tenderness, but was stable. Hagy received injections to her right knee and was advised to resume activities as tolerated.

Treatment notes from 2021 show that Hagy was in no acute distress; her back and extremities had normal range of motion; she had normal curvature of the spine; her reflexes were 2/4 and symmetric, bilaterally; she had an antalgic and limping gait on the right; her extremities had no edema; and her peripheral pulses were normal, bilaterally. In January and February 2021, Hagy reported low back pain, but stated her medication helped. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ found the state agency psychologists' opinions persuasive, in part, but found that different limitations were warranted based on the overall record. (R. at 25.) The ALJ noted the state agency psychologists' assessments were partially consistent with the other evidence of record because the totality of the evidence

-18-

supported no limitation in adapting or managing herself. (R. at 25.) Hagy's examination findings routinely revealed that she was pleasant, alert and fully oriented; she had adequate grooming and hygiene; her mood and affect were normal and occasionally euthymic; she made adequate eye contact; her speech was normal; her thought process was goal-directed and organized; her insight and judgment were intact; her recent and remote memory were intact; and her attention and concentration were intact. In April 2020, Hagy's endocrinologist advised that she could return in one year, which suggests her thyroid condition was relatively stable. Hagy reported counseling and medication provided "significant benefit" for her depressive symptoms, and she reported her mood was stable. *See Gross*, 785 F.2d at 1166.

Hagy argues the ALJ did not appropriately account for her "fatigue." (Plaintiff's Brief at 10-12.) I find this argument unpersuasive. The ALJ noted that, although Hagy complained of fatigue off and on, she often denied or failed to report fatigue or other constitutional symptoms. (R. at 23.) However, despite her sporadic complaints of fatigue, she was found to be pleasant, alert and fully oriented; she had adequate grooming and hygiene; she made adequate eye contact; and her mood and affect were normal.

Here, the record contained sufficient evidence to enable the ALJ to make a decision regarding Hagy's alleged impairments such that neither a physical nor a psychological examination was warranted. Because there is sufficient evidence for the ALJ to make a decision on Hagy's physical and mental capabilities, he was not required to order a consultative examination. *See Bowen v. Astrue*, 2008 WL 2455399, at *17 (W.D. Va. 2008). Based on the above, I do not find that the ALJ erred by failing to order physical and psychological examinations as the record

contains sufficient evidence from which the ALJ could determine Hagy's residual functional capacity.

For these reasons, I find the ALJ reasonably considered the evidence and reasonably supported his rationale for his findings. Hagy's arguments appear to be nothing more than an effort to convince the court to reweigh the evidence, which it cannot do on judicial review.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

2.  Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3.  Substantial evidence exists in the record to support the Commissioner's finding that Hagy was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Hagy's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    April 11, 2023.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE